case. Mr. Torres, may it please the court, the board's order in this case should not be enforced because it is based upon erroneous legal foundations. Look, I have to say, I do not understand your position at all. I don't understand why you don't want to permit this, you know, investigator for the Union to come in and spend an hour or two in the factory looking around and, you know, trying to see whether she has any insights into the cause of the accident. How can that harm Caterpillar? Your Honor, the question here is not whether... No, you answer my question. How can that harm Caterpillar to allow the Union rep to come in and look around? Are they afraid she's going to go into business and competition with Caterpillar? Sell their secrets to other companies or what? Your Honor, I don't think that Caterpillar offered any of those reasons as why they were not allowing the investigator to come onto the premises. The first request from the Union was... Would you just answer my question. Why is Caterpillar... What is the harm to Caterpillar of this investigator spending a couple of hours looking around? I'm sure there's no actual harm to Caterpillar. Well, if there's no actual harm, there is obviously actual harm to the Union in saying that their investigator can't come in because that makes the Union stop for them, right? Look, if you have a death in a plant, that upsets the workers. Yes, Your Honor. Now, they have a Union. They expect the Union to be active in protecting them against workplace hazards. If the investigator isn't permitted to come into the building, the workers wonder, where's the Union? They're supposed to be helping us avoid these accidents. Well, Your Honor, the legal principles that govern non-employee access do not allow for such unfettered access. Would you please give me a reason, not a principle, a reason why it is a harm? We know, I just said, it's a harm to the Union and to the workers to keep this Well, Your Honor, I think I've already conceded to you that there is no demonstrable harm to the company. And I think I've already... Well, then I don't get, then I don't understand why you're here. If there's no harm, why do you care? Your Honor, the principles that govern whether or not access is permitted... I don't understand you with your principles. If there is no harm to having this person here, and the Union wants it, and I'm sure the workers welcome a demonstration that the Union is interested in their safety, why is Caterpillar bothering to challenge the Labor Board's order? Your Honor, the Union's ability to demonstrate its utility to the employees is not solely dependent upon the ability of one non-employee to gain access. Not solely, no, but it's important. We're not talking about the leaky faucet example that you gave in your brief, which was insulting to the memory of Mr. Smith. We're talking about a fatal accident in a dangerous factory. Yes, Your Honor. Now, I don't understand why, in that kind of situation, a reasonable application of the balancing test under Holyoke Power would not essentially always call for access, with reasonable limits. Your Honor, it may be that ultimately, if the Union had actually substantively engaged the company in a discussion about the circumstances... You guys were playing games. Don't spend a lot of time on offers and counter-offers here. The question is, OSHA had access, the police had access, they couldn't figure out what happened, right? Yes, Your Honor. Okay, so if you want to know, I assume Caterpillar would really like to know what happened in this accident, right? I think it went to significant lengths to try and determine what happened. Unsuccessfully. Unsuccessfully. So why not let Ms. Thompson give it a try? Your Honor, that's, again, with all due respect, I think that's what the company's efforts were trying to do, was to explore whether there was any benefit to having... By limiting her to two-dimensional exposure, right? Watching films. Well, that wasn't the only offer the company made to Ms. Thompson. No, but that's the critical difference, isn't it, between the access that she sought and what you all were willing to provide? Well, perhaps, Your Honor, but that wasn't the only thing that we offered Ms. Thompson. If the record was that the only thing we offered Ms. Thompson was a single, two-dimensional video... That is not what I said. Nobody thinks that. But the critical difference here between... That is the point of dispute is, does she get into the plant to, in essence, see this in three dimensions, right? Correct. Okay. At the risk, I don't want to be flip about this, but I can think of an awful lot of situations where the ability to experience a setting, real dimensions, real speed, distance, is critical. Again, at the risk of being flip, if you watch a big league pitcher on TV, it's a very different experience from watching that pitch come in as you look over the catcher's shoulder, right? I can't be sure. Same thing, whether it's football. Same thing, picture yourself, the difference between hiking in the Grand Canyon and watching a film of the Grand Canyon. Would you agree there's a difference? Depending upon where you're viewing the video, perhaps. And if you've had the experience of being in the real setting to appreciate the dimensions, then you can also understand a film better, right? Correct, Your Honor. All of that leads me to think the ALJ was exactly right in thinking that there really is no substitute for actually getting into this scene where all of the other investigators were able to view the scene. Well, Your Honor, the question of whether or not and when and under what circumstances Ms. Thompson could or should have been allowed such access was certainly something that we never discounted as a possibility. No, you prohibited it. Well, Your Honor. At the time when it would have been most meaningful. Well, it would have been most meaningful at a time when the processes were still in place, but by the time... She was there the next day, right? Yes, Your Honor. And by the time Ms. Thompson offered some, the union offered some substantive explanation of its desire to be... Oh, come on. Let's... Well, look, things had been changed by the time she arrived the next day, right? Correct. And you make a big deal out of that. Nevertheless, there was a second reenactment by the company about a week later, correct? Correct. Did you tell the local union officials you were going to do that? I don't believe that the evidence shows that they were... Why not? I don't... Anybody think of inviting Ms. Thompson to that? At that time, I don't think Ms. Thompson had made an additional request. The initial request... Oh, come on. Obviously, she wanted to investigate the fatal accident, and you knew she wanted to investigate it. Your plant manager had checked with legal and said no, and then you're having another reenactment and you don't even bother to tell the union? Well, I believe the evidence is that there were members of the union that were involved in... Members of the union participated. The question is whether you gave union officials, not line workers who were there to follow orders. Did you give notice to union officials that you were going to be doing this reenactment so that Ms. Thompson would have an opportunity to at least ask if she could come watch that one? Well, I believe, again, we were aware of Ms. Thompson's desire to be on the premises, Your Honor. And what rationale for not extending that invitation? Your Honor, I believe at that point, the parties were still discussing the circumstances under whether and when Ms. Thompson might be permitted on the facility. I mean, Your Honor, the law, the principles that govern this, you can look at any request for non-employee access to a facility and resolve it on the basis... This is not a non-employee access to a facility. We're looking at Holyoke Power. This is a union official. This is not some passer-by who says, oh, I'd like to look inside your plant, see what you do there. I'm curious. Your Honor, the law, Leekmuir and the balancing test in Holyoke and numerous others... Yeah, but you know, the problem with the balancing, your problem is there is nothing on your side of the balance. I just respectfully disagree. Well, all right, tell us what is the... That's my initial question. What is the potential harm, cost, burden, what have you, to Caterpillar of allowing her to look around? There is no palpable harm, Your Honor, but... Then how can you have... If you have a balancing test with two pans, one of them is empty. Yours is empty. And now you... Now, how is it that your pan is going to outweigh the one that has weights in it? Because Leekmuir does not turn on whether or not... Can you tell me what is balanced? So what I think you're about to tell us is that you're relying entirely on the suggestion that Leekmuir should be extended to safety inspections as distinct from organizing efforts. Is that right? I believe that that's correct. Has the Supreme Court taken that step? I think the way in which it describes... Has the Supreme Court taken that step? It has not, Your Honor. Has any circuit court taken that step? Not that I'm aware of. Has the NLRB taken that step? Yes, it has, Your Honor. When? I believe that the Success Villages case we cited, Estonia Village, Leslie Holmes, are cases that consider the application of Leekmuir in the non-organizational context. Do any of them have anything to do with safety and health inspections? They do not, Your Honor, but... Okay, so what you're asking for is a real novelty then here, although you haven't acknowledged it. Instead, you're telling us this is all perfectly obvious and that access for the union officials in this situation is a, quote, last resort, right? Yes, Your Honor. Has anybody else ever used that phrase, last resort, besides your reply brief? I believe that the upshot of Leekmuir holds exactly the same, Your Honor, that the balance that is to be struck assumes that the employer's property rights are predominant, except in exceptional circumstances. I'd like to reserve the rest of my time for rebuttal. Thank you, Your Honor. Okay. Thank you, Mr. Torres. Mr. Grella? Good morning, Your Honors. May it please the Court, my name is Jamison Grella for the NLRB. I'll be reserving five minutes of my time for the intervening respondent, United Steel Workers. This is a very straightforward case applying very well-settled law to very clear, uncontested facts. Substantial record of evidence supports the Board's conclusion that the company's September 9, 2011 refusal to permit an agent of its employees' bargaining representative from accessing its facility to investigate a fatal industrial accident violated the National Labor Relations Act. The company has not demonstrated that its employees' right to responsible representation must yield to its property rights. In this regard, the company has not satisfied its burden under the record viewed as a whole that the union could have effectively represented employees through alternate means. Additionally, this case presents a justiciable matter under Article III because it provides for prospective remedies against the company's past unlawful conduct. The company has not satisfied its heavy burden to demonstrate that this case is moot. The company continues its unlawful course of conduct to this day by continuing to deny Ms. Thompson access. Mr. Grella, as I understand this, we didn't talk with Mr. Torres about the mootness question. Do you think the issue is whether there is a risk of an identical accident or is it whether there's a risk of future denial of access to steel workers' representatives in the event of a safety investigation? It's the latter. The risk is future denial of access and the company has provided no evidence whatsoever. That's the future dimension of the order. But there's still a retrospective purpose to this, isn't there? Because Ms. Thompson still hasn't had a full opportunity to look at Mr. Smith's fatal accident. That's absolutely correct. And it may or may not help at this point. We don't know, but it's hard to see how it would hurt. Exactly. And that's why, in that regard, the board orders not just an investigation but also a health and safety inspection of all the areas where the company is doing similar turn-and-crawler procedures of these enormous strip mining components. Is this a one-time thing? The health and safety inspection? No, the fact of her access. When she first encountered whoever it was, it said she wasn't welcome. That was for her to have that opportunity to make an inspection of the site. Now it's four years later or something like that. Is the objective just to have a right to do this? Or is it the objective to actually look at the site and have future access? It's both. But I would caveat that future access in similar or identical circumstances is contemplated under the board order. But if, for example, there was an accident, God forbid, in another part of the employer's plant, this would have to be litigated again. So this access is, I guess, limited to a response of a specific accident? Yes. The board's order is trying to remedy the September 9, 2011, unlawful refusal. Okay. So the access that she would be granted as a result of this argument, that she would be able to go and look around. Obviously, everything's changed. But it doesn't mean that she can come in once a month just to see how things are going. Not necessarily. But I would provide the caveat that ultimately, what the board's order requires is reasonable places, reasonable time, reasonable duration. And ideally, the union and the company will be able to, if and when this court were to enforce the board's order, they would come to an agreement as to what those terms meant, whether it was once a month, whether it was one time. However, if there was disagreement, there would be a compliance hearing where the company would receive full due process rights before an administrative law judge and ultimately judicial review over what the order requires specifically based on this case. But as a result of this argument, I guess that you would expect at least one visit. At a minimum. Well... At least one, yes. Yeah, I mean, one is... Okay, that's all I'm asking. I'd like... One of the arguments the company made is that the board has in fact applied leech mirror to the representational access context. In fact, the company has only cited one such case in which representational access was actually a factor, and that is Success Village. As we mentioned in our brief, and I'd like to mention now, that Success Village does not quite support the company's proposition on this matter because no exceptions were ever taken to the ALJ's decision onto that portion of the board's orders. The board has never considered whether or not leech mirror should be extended to the representational access context. And I think that's significant because as Your Honor has correctly pointed out, the company cannot point to any authority for this argument that representational access, where a company has an established bargaining obligation imposed under the act with a union that its employees have freely chosen to be their bargaining representative, should be treated similar to unions attempting to organize employees under Babcock and Wilcox and leech mirror. In which case, those cases were premised on the fact that organizing unions have a derivative section 7 right. Whereas in this case, we have an actual bargaining representative who has its own obligations imposed on it under the act under section 9A and under section 8D  and the mutual obligation shared by the company. In this regard, the board appropriately applied Holyoke water power and the company's suggestions that by first looking at the relevance of the information requested is misplaced. In that regard, the company's argument in its brief about the leaky faucet analogy does have some relevance in this in the sense that that's where the relevance of the information would come in. If it was a union seeking access to do a health and safety inspection on account of a leaky faucet, then the relevance of that information vis-a-vis bargaining unit employee safety would become an issue. And only then once you've established that relevance would you get the actual balancing which would take place under Holyoke. And to correctly point out, the company has not demonstrated that by any evidence that its property rights should predominate. It has not demonstrated an exclusionary property right. It has not demonstrated that the alternatives that it did provide the union and the plethora of alternatives that it came up with during the administrative hearing that it believed Ms. Thompson should have asked for would be a substitute for access. On the contrary, on the other side of the pan as it were, Ms. Thompson, the union safety expert, did credibly testify that the alternatives before her were not sufficient, that access was still required. And I think that that really is what this case is about. It's about the fact that the employer has not met its evidentiary burden here. It has not. The company could have brought its own expert and explained and presented testimony to the fact that the report provided by union rep Jim Novak, that the OSHA reports, that the law enforcement reports, that the photographs and the DVDs were, would satisfy what Ms. Thompson could hope to learn if she were to visit the site herself. The company didn't attempt to proffer such evidence. With that in mind, I think that... Mr. Grillo, if I could... I understand the board's argument to be, this may be a balancing test, but in the case of a fatal or serious accident, it seems like it's almost always going to weigh in favor of access. I don't believe the court has to rule that broadly in this case. Well, let me throw out something to you, and if Mr. Torres wants to comment on this, I'd be interested in his thoughts as well. At least in trials involving accidents, ordinary civil trials, an accident reconstruction expert who has never visited the site is going to be cross-examined on that fact. It is the most obvious, the easiest line of attack to undermine his or her credibility. And if every other investigator of this accident had access and Ms. Thompson did not, that handicaps her. And that's always, I think, likely to wind up being true. Maybe we don't have to decide it's always, but I at least want to throw that out as a hypothesis. I think there's a certain degree of merit to that, but I do think that even in situations where a workplace fatality of a unit employee has occurred, you still, under Holyoke Water Power, have to balance the interests. And I agree that it, that may make a company's burden much more difficult under Holyoke Water Power to demonstrate that some alternative means would satisfy the employee's representational access. But I don't think it's categorically precluded. I see that my time is up. If there are no further questions, the board respectfully ask that it's order be enforced. Thank you, Mr. Grillo. So, Ms. Fisher? Good morning, your honors. May it please the court. My name is Amanda Fisher, counsel for the Intervenor Union. Jeff Smith died when a routine procedure went very wrong. To this day, USW members regularly perform the same procedure, which as Caterpillar itself explained to the union in a letter, is actually an unavoidable part of manufacturing the crawler equipment. So, the cause of the accident that killed Mr. Smith has never been determined, and the union continues to have concerns about the safety of the crawler rotation procedure. Our members continue to be exposed to potentially life-threatening safety hazards without having had the benefit of their union representative investigating the crawler rotation procedure and potentially determining ways to make that procedure safer and preventing future accidents. This is despite the fact that the parties have agreed in the CBA that was in place at the time of the accident that the company and the union will cooperate in the objective of eliminating accidents, health hazards, and protecting the plant environment. So, why wasn't there more dialogue from the union side? Why not at least accept what the employer was offering, see if it was sufficient, and then build a further foundation if you didn't think that was enough? Well, Your Honor, there actually was an incredible amount of dialogue between the union and the company after September 9th when access was denied and September 12th when the union filed its NLRB charge. The company wrote to the union on September 16th and explained that OSHA and local law enforcement had access and that the local union officials were present for the OSHA investigation and so the company said that that was sufficient and so therefore the union wouldn't need access. The union responded to that letter on September 26th and explained that the role of OSHA is distinct from the role of the union. I know we've got all that laid out in painstaking detail. I'm just trying to understand why the union didn't, in essence, take what was on the table without waiving your right to go after more. Well, we did actually, for example, when the DVD was offered, the union said to the company, we will accept the DVD. We don't think at this time that the DVD is going to be sufficient. However, we'll accept the DVD, we'll review it and we will let you know at that point  There was a lengthy process of negotiating a confidentiality agreement to receive the DVD. Once we received the DVD, we said this is not sufficient. This doesn't satisfy our need to properly investigate this accident scene. Similarly, the company offered other two-dimensional photographs, the police report. The union, once again, said we will accept all of that. We want all of that. However, the union did inform the company that those two-dimensional reports and photographs were not going to be sufficient. That was continually expressed to the company throughout the communication. And we also continued to express to the company that because this crawler manufacturing procedure continues to happen to this day, there are many other opportunities for the union to be able to come in and view the process. Why do you think the company didn't want to let Ms. Thompson in? Honestly, I don't know. The union, or I'm sorry, the company to the board made, to the ALJ made the argument that it had confidentiality concerns. However, in its brief to this court, the company did not raise the confidentiality concerns. In regards to the confidentiality concerns, we were willing to enter into a confidentiality agreement to receive the DVD. The company seems to have dropped that as its reason. So I can't say that I know why Caterpillar is opposed to having the union investigate this accident. It seems to us that, you know, in the case of a fatal workplace accident, especially in this case where neither OSHA, the police, or the company were able to determine the cause of the accident, why you wouldn't want another person to come in and take a shot at determining the cause, I'm just not sure. Is there some specific expertise that Ms. Thompson had? Yes. Was she an investigator for accidents? Yes. Ms. Thompson has worked in the union's health and safety department for a number of years. She's been a member of the emergency response team,  to investigate fatal and catastrophic accidents. I believe she's been a member of the emergency response team for seven years. In that time, she's investigated eight to 10 fatalities. She's also a certified industrial hygienist. Okay, that's good. My next question, though, is in those processes, if you know, was she able to go in with people who were on site, probably union members? To talk with them while she's walking around? Or is there some limit on that? Well, I think that depends on individual circumstances. Ideally, we would want her to be able to go in and have access and have local union members who perform that job or who work in the area where the accident occurred, or management representatives be with her to explain things to her. That would be the ideal scenario. And I'll just say that in the vast majority of cases where the union is sent out, where the ERT team is sent out to investigate accidents, the access issue is not a problem. All right, thank you. If you have no further questions, I thank you. Thank you, Mr. Torres. To start with your question, Your Honor, concerning the relative, I guess, credibility of a particular investigator, I'm not sure that that's really a relevant issue. No one's doubting Ms. Thompson's credentials, Ms. Thompson's expertise. Not right now, but certainly there is potential for future controversy. Put yourself back at the time in 2011 when the accident happens. Nobody knows what the results of anybody's investigation will be, right? Yes, Your Honor. And there's potential for litigation, for administrative hearings, OSHA proceedings, who knows what, right? Yes, Your Honor. So there's certainly potential for concerns about the credibility of competing conclusions about the reasons for the accident, right? Outside the NLRA context, perhaps, Your Honor. I mean, that's certainly not anything that was discussed or at issue that motivated any of the consideration. Well, what did motivate the company's consideration since there was no harm, you've told us? Your Honor, I think at the time that the request was first made by the union, there was a request for a joint investigation and the company responded that it believed that the matter had been looked at by OSHA, by the law enforcement. What was the motivation? The motivation at the time, Your Honor, was that they saw no need for any further investigation, an independent or joint investigation. Just taking a whack at the union. You know, your company will be in real trouble the next time there's a fatality. Well, Your Honor, again, I think to... People look back, they say, well, you know, they never found out the cause of that previous fatality and they didn't allow the union investigator to look into it. Caterpillar's strategy, unless they're trying to kill the union or something, Caterpillar's behavior in this matter is incomprehensible. Incidentally, I looked at the videos. I didn't get the faintest clue from those videos of the cause of the accident. Has someone explained how looking at those videos, you learned anything about the accident? All you see is this big chunk of metal being moved around by a chain. What is that? What is that supposed to show? Well, Your Honor, I think what it showed was the actual process that was in place when the accident occurred. I don't understand that. What it shows is a huge block of steel or whatever it is, which you would not like to have fall on you, being dragged around in very slow motions, being shifted slightly by a chain. There's no context. I don't know what anyone would make out of that. Well, Your Honor, that was the only piece of information that was available. That may be something that requires further elaboration. Well, you think that... And it only shows it from one side. That struck me as very puzzling. Why isn't this mechanism, you know, with a chain and a huge chunk of metal, why isn't it shown from the other side as well? It's incompetent. I believe that the protocols that explain what was happening, were also provided. The ones that were in place at the time, as well as the ones that were modified. But as to whether or not there's a future dispute, no one is saying that Caterpillar has not taken the position it would never allow the union access. It's negotiated access provisions in the contract that deal with local union commitments. Why wasn't the video also taken from the other side? I don't know that there's any evidence in the record as to why that was, Your Honor. Okay. Well, thank you very much. Thank you. Mr. Grell and Ms. Fisher. Move on to our next...